# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Farrell,                                :
                        Appellant     :
                                                :
          v.                                    :     No. 1623 C.D. 2017
                                                :     Argued:  May 8, 2018
Wesex Corporation                       :


BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
                    HONORABLE ELLEN CEISLER, Judge
                    HONORABLE DAN PELLEGRINI, Senior Judge


*OPINION NOT REPORTED*


MEMORANDUM OPINION
BY JUDGE BROBSON                         FILED:  June 29, 2018


          Appellant City of Farrell (City) appeals from a final order of the Court of Common Pleas of Mercer County (trial court), dated October 10, 2017.  The trial court denied the City's petition to strike off or open judgment of *non pros* (Petition), relating to the City's Complaint concerning the alleged failure of Appellee Wesex Corporation (Wesex) to pay its alleged debt obligations to the City.  The City challenges not only the trial court's October 10, 2017 order denying its Petition, but also:  (1) the trial court's August 24, 2017 order, granting Wesex's motion for the entry of judgment of *non pros*; and (2) the trial court's February 16, 2007 order, sustaining a preliminary objection to Count II of the City's Complaint, which

claimed that Wesex acted fraudulently with regard to the debt obligations it allegedly owed the City.[1]  For the reasons set forth below, we affirm the trial court's order.

## I. BACKGROUND

To fully understand how this matter is presently before the Court, a summary of the basic facts and procedural history from our prior unreported decision in *City of Farrell I*[2] is necessary and helpful:

> On or about August 9, 2006, the City filed a Complaint against Wesex.  The Complaint included the following factual averments.  In 1991, Sharon Steel Corporation (Sharon Steel) constructed and/or completed a three-story office building in the City.  The City, a non-profit development corporation, and the City of Sharon [each] provided public loans for the project.  Of a total of $1,370,000 in loans, the City lent Sharon Steel $800,000.  All of the loans were secured through mortgages.  Wesex was the construction contractor that erected the building.  Wesex claimed that in order to complete the building, it needed additional funds, and Sharon Steel entered into a mortgage arrangement with Wesex, which created an $84,000 subordinate lien interest

---

[1] The City also challenges the trial court's February 18, 2015 order, granting Wesex's motion for the entry of judgment of *non pros*.  This Court, however, vacated the trial court's February 18, 2015 order in our prior unreported decision in *City of Farrell v. Wesex Corporation* (Pa. Cmwlth., No. 840 C.D. 2015, filed March 15, 2016) (*City of Farrell I*).  The City argues that the trial court's February 18, 2015 order is relevant to this appeal because it was "largely reaffirmed" by the trial court's August 24, 2017 memorandum opinion and order. (City's Br. at 1.)  We disagree.  As explained by the trial court in its 1925(a) opinion, the trial court's August 24, 2017 memorandum opinion and order "merely adopted the rationale and findings set forth in the February 18, 2015 [order] regarding the actual prejudice prong of the *non pros* test" because the parties provided "no additional evidence or information" to the trial court at the subsequent evidentiary hearing.  (Trial Ct. 1925(a) Op. at 4-5; Reproduced Record (R.R.) at 1281a-82a.)  For these reasons, the trial court's February 18, 2015 order is irrelevant to and has no effect on this appeal, and we will not address any arguments relative to such order in this opinion.

[2] Pursuant to Commonwealth Court Internal Operating Procedure No. 414(a), "[a]n unreported opinion of this [C]ourt may be cited and relied upon when it is relevant under the doctrine of law of the case, res judicata or collateral estoppel."

in favor of Wesex. Sharon Steel later filed a voluntary bankruptcy petition in the United States Bankruptcy Court for the Western District of Pennsylvania. At that time, Sharon Steel was in default of the terms of the three public-body mortgages, but the bankruptcy proceedings stayed foreclosure proceedings. When the building was released from the jurisdiction of the bankruptcy court, Wesex and the three public lenders entered into a novation, whereby the lenders would forego foreclosure proceedings and Wesex would acquire title to the building and satisfy the loans, including past-due interest amounts and late charges.

In 2004, Wesex advised the City that it intended to convey the property and requested confirmation of the amount still owed to the City. The City, however, could not locate documentation that would reveal that amount. At the time that Wesex contacted the City for confirmation of the amount due, Wesex had possession of a 1996 communication directed to Wesex's Certified Public Accountant, describing the amount it owed on the loan. Wesex "feigned ignorance of its Proposal intending to mislead [the City] to accept a sum substantially less than what [Wesex] knew or should have known was due [the City]." On October 11, 2005, Wesex sent a letter to the City Council "again fraudulently" representing that the parties had to agree to a final payoff amount because no documentation was available to determine the actual payoff amount. Based upon these factual allegations, the City sought damages based upon three causes of action: (1) breach of contract (Count I); (2) fraud (Count II); and (3) unjust enrichment (Count III).

Wesex filed preliminary objections to the Complaint, and the trial court, by the order dated February 16, 2007, sustained the objection to Count II. Thereafter, Wesex filed an answer to the Complaint, new matter, and a counterclaim. In the counterclaim, Wesex asserted that the agreement it had with the City regarding the building limited the City's recourse to foreclosure proceedings, and that the City, by initiating the claims in the Complaint, breached the agreement. Wesex asserted that it has and will incur litigation costs as a result of the

3

alleged breach. The City filed preliminary objections to the counterclaim, which the trial court sustained.

The parties engaged in discovery during 2008 and 2009. On April 15, 2014, the City filed a notice to complete discovery pursuant to local practice. On May 9, 2014, Wesex filed a motion for entry of a judgment of *non pros* against the City. . . .[3]

. . . .

. . . [O]n July 7, 2014, the trial court issued an order providing the parties with time to prepare a joint record and/or stipulations of fact "to address the question of whether the delay caused actual prejudice to [Wesex]. Either party may schedule an evidentiary hearing if necessary." The order did not mention the first or second prong of the *non pros* analysis—*i.e.*, whether the City acted with a lack of due diligence and whether the City had compelling reasons to delay its prosecution of the Complaint.

On November 3, 2014, in accordance with the trial court's order, the parties submitted a joint stipulation of facts, which did not relate to the first or second *non pros* prong[]. On the same date, Wesex filed a praecipe for evidentiary hearing. In the praecipe, Wesex indicated that although the joint stipulation resolved some issues pertinent to the *non pros* motion, a hearing was necessary in order for Wesex to demonstrate that the City's delay in prosecuting its Complaint prejudiced Wesex. On January 29, 2015, the trial court held a hearing on the prejudice prong of the *non pros* motion.

On February 18, 2015, the trial court issued its order granting Wesex's motion for judgment of *non pros*, providing that the City's failure to pursue its claim

---

[3] In *Jacobs v. Halloran*, 710 A.2d 1098 (Pa. 1998), our Supreme Court reinstated the three-part test established by *James Brothers Lumber Company v. Union Banking & Trust Company of DuBois, Pennsylvania*, 247 A.2d 587 (Pa. 1968), to determine whether a case should be dismissed for inactivity pursuant to a defendant's motion for *non pros*. Under that test, the trial court must be satisfied that there was a lack of due diligence on the part of the plaintiff in failing to proceed with reasonable promptitude, no compelling reason for the delay, and *actual* prejudice to the defendant caused by the delay. *Jacobs*, 710 A.2d at 1103.

4

between September 2009 and April 2014 constituted "a lack of due diligence to proceed with reasonable promptness which occurred without any compelling reason" and that the inaction "caused substantial prejudice to the ability of [Wesex] to defend this matter."

*City of Farrell I*, slip. op. at 1-5 (footnotes and citations omitted).

The City appealed the trial court's decision to this Court, arguing, *inter alia*, that the trial court abused its discretion by entering the *non pros* judgment because no hearing was conducted regarding the first two prongs of the *non pros* test. In its 1925(a) opinion, the trial court noted that it was not until the City filed its statement of errors complained of on appeal that it became aware that the City wanted to have an evidentiary hearing on those issues. Nevertheless, the trial court concluded that the City had been denied due process and, therefore, the trial court entered its February 18, 2015 order in error with regard to the first and second prongs of the *non pros* standard. Ultimately, the trial court recommended that this Court remand the matter for the development of a record pertaining to the first and second *non pros* prongs. In *City of Farrell I*, this Court concluded that the trial court abused its discretion in failing to provide the parties with the opportunity for a hearing to present evidence on the first two prongs of the *non pros* test. As a result, this Court vacated the trial court's February 18, 2015 order and remanded the matter to the trial court for further proceedings.

Thereafter, on July 24, 2017, the trial court held a hearing to take evidence on the first two prongs of the *non pros* test—*i.e.*, lack of due diligence and no compelling reason for the delay. At the hearing, the City presented the testimony of Michael Ceci (Mr. Ceci), who has served as the City's City Manager since November 2011. (Reproduced Record (R.R.) at 371a, 413a.) Mr. Ceci testified that

5

the City has been an Act 47[4] distressed community since 1987. (*Id.* at 377a-78a.) Mr. Ceci explained that 2008 began a period of deficits and a decline in certain revenue items for the City, including such things as: (1) real estate taxes; (2) real estate transfer taxes; and (3) earned income taxes. (*Id.* at 380a-87a.) Mr. Ceci explained further that when faced with these deficits and revenue declines, the City would take drastic measures to just provide the basic services and

> would analyze what are the needs of the community first and foremost. We have to plow the streets. We have to pay the police. [We] have to make sure the fire trucks are running. Those are the priorities of any municipality. So [we] have to ensure that the funds and cash flow are available to pay for those services first, and control the things that you have control of.

(*Id.* at 381a, 387a, 392a, 395a.) Mr. Ceci stated that in order to combat these deficits and declining revenues, the City has attempted to increase revenues and control and decrease its costs by outsourcing its garbage collection, cutting staffing, combining certain job positions within the City, replacing the income tax collector with the county-wide system, transferring responsibility for its library to a local non-profit organization, leaving the regional police department, and decreasing the number of paid firefighters. (*Id.* at 387a-91a.) Mr. Ceci also stated that in years when the budget is under control and there are no deficits, the City is able to shift available funds from different budget line items for emergencies. (*Id.* at 416a-18a.)

Mr. Ceci testified further that the City reduced the amount it paid for legal services from 2009 through 2013, including with respect to this case, and made the decision to place several new litigation matters on the "back burner" because the City did not have any money to spend on legal expenses. (*Id.* at 391a-93a.) Mr. Ceci

---

[4] "Act 47" refers to the Municipalities Financial Recovery Act (Act 47), Act of July 10, 1987, P.L. 246, *as amended*, 53 P.S. §§ 11701.101-.141.

6

indicated that the City's inability to proceed with this case came down "to choices being made with the dollars [the City had] available." (*Id.* at 395a.) He stated that the City just did not have sufficient assets from 2009 to 2013 to pay for this litigation. (*Id.* at 395a-97a, 427a.) Mr. Ceci admitted, however, that there was at least one year when the City did not spend the amount budgeted for legal expenses. (*Id.* at 405a-09a.) Mr. Ceci also admitted that he was unaware of any time when the Act 47 Coordinator stepped in to prevent spending on this litigation. (*Id.* at 411a-12a, 429a.) Mr. Ceci testified further that in connection with the City's Act 47 Recovery Plan for 2013 and the recommendation of the Act 47 Coordinator, he made funds available to proceed with this litigation beginning in early 2014. (*Id.* at 396a-97a, 414a-16a.) Mr. Ceci also testified that he did not receive a request from the City's solicitor for extra funds to pay for an expert in this case until around 2014. (*Id.* at 428a-29a.)

The City also presented the testimony of Stephen Mirizio (Solicitor Mirizio), the City's Solicitor. Solicitor Mirizio testified that there was a lack of movement on this case between late 2009 and early 2014 because the City did not have any funds available. (*Id.* at 438a.) Solicitor Mirizio explained that between 2009 and 2011, he had discussions with Lavon Saternow (Ms. Saternow), the City's prior City Manager, about Ms. Saternow's concerns regarding the drop in the City's revenues and the costs involved with proceeding with this litigation. (*Id.* at 439a-40a.) Solicitor Mirizio indicated that while he did not know the "actual dollars and cents," he knew that the City was experiencing a serious shortfall between the budget and generated revenues. (*Id.* at 441a-43a.) Solicitor Mirizio admitted, however, that the City was an Act 47 financially distressed community before this lawsuit was filed, before the City entered into the mortgage satisfaction

7

with Wesex, and before Wesex built the Sharon Steel building. (*Id.* at 446a-48a.) Solicitor Mirizio admitted further that he was able to proceed with this litigation for almost three years while the City was an Act 47 distressed community. (*Id.* at 448a.) Solicitor Mirizio testified that the Act 47 Coordinator, City Council, and Ms. Saternow never instructed him not to spend money on this litigation; rather, the City Council and Ms. Saternow advised him to be cautious with respect to money spent on this litigation due to the City's decreased revenues. (*Id.* at 448a-52a, 478a, 483a-84a.)

Solicitor Mirizio testified further that the City's first forensic accountant reviewed documents and provided a trail of journal entries but did not provide a report. (*Id.* at 466a-68a.) Solicitor Mirizio confirmed that the only thing left for the new expert to do was to prepare a report based, in part, on the first forensic accountant's notes and financial information, which the new expert did not do until February 2014. (*Id.* at 469a-74a.) Solicitor Mirizio explained further that, based on its financial condition, the City was not able to pay the new expert to prepare the report prior to that time. (*Id.* at 469a.) Solicitor Mirizio admitted, nevertheless, that the City Council never denied any of his requests for funds to pay for experts in this litigation. (*Id.* at 475a.) Solicitor Mirizio testified further that, but for three or four more depositions and the preparation of the expert report, the case was pretty much trial ready at the time it went dormant. (*Id.* at 484a-86a.) Solicitor Mirizio also testified that in 2014, Mr. Ceci advised him to reactivate this case. (*Id.* at 487a-88a.) Solicitor Mirizio explained that pursuing this case became practical again because

8

the City had an increase of revenue and was no longer subject to budget constraints.[5] (*Id.* at 488a.)

The parties presented evidence on the third prong of the *non pros* test— *i.e.*, actual prejudice to Wesex—at the hearing held on January 29, 2015. At that time, Wesex presented the testimony of Gregory Koledin (Mr. G. Koledin), Wesex's President.[6] (*Id.* at 132a.) Mr. G. Koledin testified that Emil Koledin (Mr. E. Koledin), his father, served as Wesex's President from its inception through 2006. (*Id.*) Mr. G. Koledin explained that during that time, Mr. E. Koledin was the "heart and soul of Wesex" and managed Wesex's day-to-day operations, including the construction of the Sharon Steel building, the Sharon Steel bankruptcy, Wesex's acquisition of the Sharon Steel building, the negotiation of the alleged oral agreement with the City regarding the assumption of mortgage, and the subsequent lease for the Sharon Steel building. (*Id.* at 134a-38a.) Mr. G. Koledin also explained that any questions regarding Wesex's operations prior to 2000, including the acquisition of the Sharon Steel building and any alleged oral agreement between Wesex and the City regarding the mortgage, could be answered by Mr. E. Koledin, not him. (*Id.* at 147a-49a.) Mr. G. Koledin explained further that no one other than Mr. E. Koledin had firsthand knowledge regarding the acquisition of the Sharon Steel building, the Sharon Steel bankruptcy, the subsequent lease of the Sharon Steel building, why payments were being made to the City and the other two public entities, or the existence of any alleged oral agreement with the City. (*Id.* at 163a-64a.) Mr. G. Koledin indicated that the Honorable John C. Reed (Judge

---

[5] Solicitor Mirizio also indicated that he believed that Ms. Saternow may no longer be able to provide reliable or competent testimony in this matter because Ms. Saternow appears to become confused at times. (*Id.* at 438a-39a, 479a-80a.)

[6] Mr. G. Koledin also testified as on cross-examination on behalf of the City.

9

Reed), who represented Penn Northwest, one of the other involved parties in the Sharon Steel building/mortgages/bankruptcy, may be able to testify regarding his conversations with Mr. E. Koledin regarding Wesex's acquisition of the Sharon Steel building. (*Id.* at 165a-67a.) Mr. G. Koledin explained, however, that Mr. E. Koledin was the sole person representing Wesex during those proceedings. (*Id.* at 166a-67a.) Mr. G. Koledin also testified that Mr. E. Koledin was almost eighty-three years old when he died suddenly after a period of bad health. (*Id.* at 155a-56a.) Mr. G. Koledin explained that, while Mr. E. Koledin had physical limitations that affected his vision and his ability to sit for a deposition for more than an hour, Mr. E. Koledin had a clear recollection of the events surrounding this litigation at the time that the parties took depositions in this matter. (*Id.* at 155a-56a, 167a-68a, 171a.)

Mr. G. Koledin testified further that Nicholas Pici (Mr. Pici) served as Wesex's accountant and was involved with certain activities surrounding the Sharon Steel building. (*Id.* at 138a-39a.) Mr. G. Koledin explained that after Mr. Pici took over as Wesex's accountant, Mr. Pici started an investigation to substantiate the balance owed to the City on the Sharon Steel building mortgage. (*Id.* at 139a-40a.) Mr. G. Koledin explained further that any active discussions regarding the payoff of the mortgage debt and the subsequent mortgage satisfaction would have been between him and Mr. Pici. (*Id.* at 157a-58a.) Mr. G. Koledin admitted that both John Dolan and Sarah Clover, two other accountants from The Dolan Group, Mr. Pici's accounting firm, also provided accounting services to Wesex, which included the preparation of Wesex's financial statements. Mr. G. Koledin believed, however, that Wesex is prejudiced by Mr. Pici's death in August 2013, during the pendency of these proceedings, because Mr. Pici reviewed the mortgage-related

10

documents and spoke with the City, and he is the only person who had knowledge as to whether the previous financial statements showing the amount owed to the City were accurate. (*Id.* at 192a-93a, 201a.)

Wesex also presented the testimony of Joseph Luciana, III (Attorney Luciana), counsel for Wesex in this matter. Attorney Luciana testified that while he was a partner at K&L Gates in Pittsburgh, Kari Horner (Attorney Horner), his associate, was responsible for the day-to-day activities in this case. (*Id.* at 174a-75a.) Attorney Luciana testified further that in March 2010, he and several of his partners left K&L Gates to start their own firm. (*Id.* at 176a.) Approximately three months later, Ms. Horner started working for Attorney Luciana's new firm, but she then left at the end of 2012, during the period of inactivity in this case, to become in-house counsel for a Pittsburgh corporation. (*Id.* at 176a, 182a.) Attorney Luciana explained that he and his firm remain friendly with Attorney Horner and could contact Attorney Horner about this case if they believed it was critical to do so. (*Id.* at 177a-78a.) Attorney Luciana explained further that Attorney Horner had all of the institutional knowledge in this case, because she handled the day-to-day activities, including the depositions, written discovery, and witness preparation. (*Id.* at 180a.) Attorney Luciana believed that Wesex is prejudiced by Attorney Horner's departure during the period of delay, because the knowledge base of a new attorney assigned to a case is not the same as the attorney who "lived through" the case. (*Id.* at 180a-81a.)

The City presented the testimony of Judge Reed, who was counsel for Penn Northwest in connection with Wesex's acquisition of the Sharon Steel building in the bankruptcy proceedings. (*Id.* at 206a-07a.) Judge Reed testified that Wesex, Penn Northwest, the City, and the City of Sharon reached an agreement regarding

11

the Sharon Steel building and the related mortgages, whereby Wesex agreed to pay Penn Northwest, the City, and the City of Sharon on an ongoing basis based on the lease payments that it received from the Sharon Steel building. (*Id.* at 207a-09a.) Judge Reed testified further that Mr. E. Koledin was the only individual at Wesex that he dealt with regarding this transaction. (*Id.* at 213a.)

The City also presented the testimony of Mr. Ceci, who testified that William A. Morocco, Sr. (Mayor Morocco), the City's former Mayor, signed the satisfaction of mortgage for the Sharon Steel building on behalf of the City. (*Id.* at 224a-25a.)

The City also presented the testimony of Solicitor Mirizio. Solicitor Mirizio testified that Mayor Morocco was "the ceremonial head of the City" and "just one of seven votes." (*Id.* at 226a.) Solicitor Mirizio explained that the City Council had to authorize Mayor Morocco to sign the mortgage satisfaction. (*Id.*) Solicitor Mirizio testified further that Mr. E. Koledin was not involved with the mortgage satisfaction for the Sharon Steel building; rather, any interactions with Wesex regarding the mortgage satisfaction were "always through [Mr. G.] Koledin." (*Id.* at 227a-28a.) Solicitor Mirizio indicated that he drafted the mortgage satisfaction for the Sharon Steel building and witnessed Mayor Morocco's signature thereon. (*Id.* at 230a-31a.) Solicitor Mirizio also indicated that the City's former solicitor represented the City during the Sharon Steel bankruptcy. (*Id.* at 236a.)

The parties also entered into a joint stipulation of facts dated October 31, 2014, wherein the parties agreed to the following relevant facts:

> 10. Wesex's sole representative during all of the discussions and negotiations regarding the acquisition of the [Sharon Steel b]uilding out of bankruptcy, the [subsequent l]ease [for such building], and the payments to the holders of the Sharon Steel [m]ortgage was [Mr. E.] Koledin.

. . . .

13. In connection with [Wesex's intention to sell the Sharon Steel building], Wesex contacted [the City] to confirm the balance of [the City's] mortgage on the [b]uilding.

14. [Mr.] Pici . . . , as Wesex's representative, attempted to investigate the amount owed to [the City] and the supporting documentation for the amount.

15. Mr. Pici's firm . . . sent a [c]onfirmation of [a]ccount to [the City], which [the City] responded to by stating they [sic] were "unsure at this time."

16. Mr. Pici further investigated the issue including, but not limited to, speaking with several people at [the City] as well as visiting [the City's] offices to try to find documentation supporting the balances set forth in Wesex's records.

. . . .

28. Wesex . . . produced a total of approximately 900 pages of documents in 2008.

29. [The City] had the vast majority of the documents prior to [Mr. G.] Koledin's deposition in July 2008.

. . . .

31. [The City] last served a set of discovery responses on September 17, 2009.

32. [The City] filed a certificate of service for those discovery responses with the [trial c]ourt on September 21, 2009.

33. That was the last substantive activity on the docket and in the case until [the City] served a [notice to complete discovery on] Wesex on April 14, 2014.

34. Between September 21, 2009 and April 14, 2014, there was no correspondence between the parties, no settlement discussions, and no exchange of discovery requests, responses or documents between the parties.

35. [Mr. E.] Koledin passed away in May 2010.

36. [Mr.] Pici passed away in August 2013.

37. [Mayor] Morocco passed away in July 2013.

(Original Record (O.R.), Item 77 (footnote omitted).)

On August 24, 2017, the trial court issued a memorandum opinion and order, granting Wesex's motion for judgment of *non pros*. In so doing, the trial court found: (1) the City's "status as an Act 47 distressed community, in and of itself, does not constitute a compelling reason for the delay" or establish "that there was not a lack of due diligence on [the City's] part in pursuing this matter"; (2) the City's "financial hardship during the delay period, while unfortunate, does not rise to the level of a compelling reason for the delay"; and (3) the City's delay in pursuing its claims caused actual and substantial prejudice to Wesex in its ability to defend against the City's claims. (Trial Ct. Op., Aug. 24, 2017, at 6-8.) Thereafter, on September 5, 2017, the City filed its Petition with the trial court. By order dated October 10, 2017, the trial court denied the City's Petition. This appeal followed.

## II. ISSUES ON APPEAL

On appeal, the City argues: (1) the trial court committed an error of law and abused its discretion by concluding that Wesex suffered actual and substantial prejudice as a result of the inactivity in this case; (2) the trial court committed an error of law and abused its discretion by concluding that the City's financial problems did not constitute a compelling reason for the delay in this case; (3) the trial court committed an error of law and abused its discretion by denying the City's Petition; and (4) the trial court committed an error of law by sustaining Wesex's preliminary objection to Count II of the City's Complaint.

14

# III. DISCUSSION

## A. Legal Standard

The Pennsylvania Supreme Court has held that "[t]he question of granting a [judgment of] *non pros* due to the failure of the plaintiff to prosecute his action within a reasonable time rests within the discretion of the trial court and will not be disturbed absent an abuse of discretion." *Jacobs*, 710 A.2d at 1101. In *Jacobs*, our Supreme Court re-affirmed the *non pros* standard developed in *James Brothers*:

> The effect of our decision today is to return to the three part test of *James Brothers*. To dismiss a case for inactivity pursuant to a defendant's motion for *non pros* there must first be a lack of due diligence on the part of the plaintiff in failing to proceed with reasonable promptitude. Second, the plaintiff must have no compelling reason for the delay. Finally, the delay must cause *actual* prejudice to the defendant. As always, this determination is to be made by the trial court, whose decision will not be disturbed absent an abuse of discretion.

*Jacobs*, 710 A.2d at 1103 (footnote omitted; emphasis in original).

## B. Actual and Substantial Prejudice

The City argues that the trial court has "never stated with any degree of specificity any facts to support its repeated bald conclusion that Wesex suffered substantial prejudice to its ability to defend this matter." (City's Br. at 7.) The City argues further that Wesex failed to establish that it suffered actual prejudice due to the deaths of Mr. E. Koledin and Mr. Pici, because Wesex did not present any evidence regarding what testimony they would provide that could not be provided by other witnesses. The City also argues that Mr. E. Koledin died approximately eight months after the last discovery was conducted, and "[e]ight months is not a failure to proceed with reasonable promptitude." (City's Br. at 15.) The City further

15

argues that Wesex failed to establish that it suffered actual prejudice by the departure of Attorney Horner from the law firm representing Wesex in these proceedings.

In response, Wesex argues that the City failed to establish that the trial court abused its discretion by concluding that "Wesex suffered substantial and actual prejudice to its ability to defend against [the City's] claims based on [the City's] nearly five[-]year delay." (Wesex's Br. at 27.) Wesex argues that it established on the record that it suffered actual and substantial prejudice as a result of the City's delay, because such delay "had caused a substantial diminution of [its] ability to present [its] case at trial." (Wesex's Br. at 17.) Wesex also argues that it has been prejudiced by the City's delay

> as a result of, among other things: (1) the death of [Mr. E.] Koledin, the "heart and soul" of Wesex at the time of the alleged oral agreement with [the City]; (2) the deaths of two other material witnesses—Mr. Pici and [Mayor] Morocco; (3) the lengthy passage of time since the events at issue occurred impacting existing witnesses' recollection of events; (4) the diminution in Wesex's ability to respond to [the City's] purported expert in light of the above; and (5) the burden incurred by Wesex to reopen a case that had been dormant for close to five years. Additionally, during the [s]econd [e]videntiary [h]earing, [the City] admitted that [Ms.] Saternow, the primary [City] witness communicating with Mr. Pici in determining the amounts owed to [the City,] is now incompetent to testify as well, which only adds to the prejudice sustained by Wesex in this matter.

(Wesex's Br. at 17.)

The City suggests that the relevant inquiry to determine whether Wesex suffered prejudice as a result of the City's unreasonable delay in this case is whether there are other witnesses who can provide the same or similar testimony as Mr. E. Koledin, Mr. Pici, and Mayor Morocco. We disagree. Wesex is entitled to present the defense of its choosing and can select those individuals who will testify

16

on its behalf and provide the necessary facts to support its defense. Whether there are other witnesses or documentation that could establish some of the same facts that Mr. E. Koledin, Mr. Pici, and Mayor Morocco would have established through their testimony is irrelevant. Mr. E. Koledin would have testified regarding, *inter alia*, the Sharon Steel bankruptcy, Wesex's acquisition of the Sharon Steel building, and the negotiation of the alleged oral agreement between Wesex and the City regarding the assumption of mortgage. Mr. Pici would have testified regarding, *inter alia*, his attempts to investigate the amount due to the City in connection with the mortgage on the Sharon Steel building. Mayor Morocco would have testified regarding, *inter alia*, his signature on the satisfaction of mortgage for the Sharon Steel building. The testimony of these witnesses appears to be critical to Wesex's presentation of its defense in this matter. With their deaths, the presentation of Wesex's defense is substantially different than it would have been in September 2009, at the time of the last activity in the case, thereby suggesting that Wesex may have suffered some prejudice from their deaths. Thus, the question becomes whether any such prejudice to Wesex was caused by the City's unreasonable delay or just the passage of time.

While we agree with the City's argument that Mr. E. Koledin's death alone may not have been sufficient to support the trial court's conclusion that Wesex suffered actual prejudice as a result of the City's unreasonable delay because it occurred in May 2010, only eight months after the last activity in the case, we must look at the totality of the circumstances. The undisputed evidence of record that Wesex relies upon to show that it was prejudiced by the City's unreasonable delay includes, but is not limited to: (1) the death of Mr. E. Koledin in May 2010; (2) the death of Mr. Pici in August 2013, almost four years after the last case activity; (3) the death of Mayor Morocco in July 2013, again, almost four years after the last case

17

activity; and (4) the impact of time on witnesses' recollection of events. Looking at the totality of this evidence, we cannot conclude that the trial court abused its discretion by concluding that Wesex suffered actual and substantial prejudice as a result of the City's unreasonable delay in this matter.

## C. Compelling Reason for the Delay

The City argues that the fact that it is the first and longest running Act 47 financially distressed community in Pennsylvania "alone [speaks] to the dire financial situation of the [City] over the past 30 plus years and evidence[s] a compelling reason for the delay, especially when coupled with the [City's] underlying financial issues." (City's Br. at 16.) The City argues further that it "literally [had] no money available for litigation." (City's Br. at 21.) In response, Wesex argues that the City failed to establish that the trial court abused its discretion by concluding that the City had no compelling reason for the delay in this case. Wesex argues further that the "trial court correctly held that [the City's] purported financial hardships experienced during the close to five[-]year delay in the litigation do not constitute a 'compelling reason' for lack of due diligence in failing to proceed with reasonable promptitude in this case." (Wesex's Br. at 28.) Wesex also argues that neither of the City's arguments—*i.e.*, "that it needed to hire an expert to analyze the documents produced by Wesex and its status as an Act 47 community inhibited that process until 2014" and that "its overall financial condition alone justifies its delay"—establish a compelling reason to justify the City's delay in this matter. (Wesex's Br. at 28-29.)

In reaching its conclusion that neither the City's status as an Act 47 distressed community nor the City's financial hardship during the delay

18

period rose to the level of a compelling reason for the City's delay in this matter, the

trial court reasoned:

> [The City] was declared to be an Act 47 distressed community in 1987 and on its own initiative commenced this lawsuit in 2007 while it was still a financially distressed community. Thus, it cannot both on the one hand pursue litigation while in this condition, and then on the other hand, hide behind the Act 47 designation to excuse its failure to promptly prosecute it.
>
> . . . .
>
> [T]hroughout the four and one-half year delay, [the City] continued to operate by shifting funds from different budget line items to pay for essential services. Notably, [the City] never instructed its attorney to put this case on hold, nor was the line item for legal services reduced during the delay period. [The City's] counsel, as City Solicitor, took it upon himself not to pursue this case further following a general comment from the City Manager at the time to watch his expenses. [The City] had never refused to pay any costs of litigation or expert witness fees previously submitted for payment in this case. In addition, the Act 47 overseer never directed [the City] or its attorney not to pursue this case. All [the City] needed to do to list this case for trial was to obtain its expert's written report. [The City's] counsel chose not to do that absent any specific directive to that effect from his client. It is also noteworthy, that the record does not show any effort by [the City] during the delay period to take or consider any of the corrective measures set forth in the revised Act 47 Plan submitted in May of 2013. Thus, these and other factors of record clearly support the finding that [the City] lacked due diligence in failing to pursue its claim when its attorney unilaterally decided to take no further action for four and one-half years until he was told to go forward by [the City].

(Trial Ct. Op., Aug. 24, 2017, at 7-8.) We cannot find error in the trial court's

reasoning and analysis and, therefore, cannot conclude that the trial court abused its

19

discretion by concluding that the City's financial problems did not constitute a compelling reason for the delay in this case.

## D. Denial of the City's Petition

The City argues that the trial court committed an error of law and abused its discretion by denying the City's Petition because: (1) the Petition was timely filed; (2) the City has presented meritorious claims against Wesex; and (3) the record does not support a finding that the requirements for the entry of judgment of *non pros* have been satisfied—*i.e.*, Wesex never established that it suffered actual prejudice caused by the delay and the City had a compelling reason for the delay. In response, Wesex argues that the trial court properly denied the City's Petition because the record supports a finding that the three elements required for the entry of a judgment of *non pros* have been satisfied in this case.

Pursuant to Pennsylvania Rule of Civil Procedure No. 3051, a plaintiff seeking relief from the entry of a judgment of *non pros* must establish: (1) that the petition seeking relief from the *non pros* judgment was timely filed; (2) that the plaintiff has presented a meritorious cause of action; and (3) that the record supports a finding that the three requirements for the entry of a judgment of *non pros*—*i.e.*, a lack of due diligence on the part of the plaintiff in failing to proceed with reasonable promptitude, no compelling reason for the delay, and actual prejudice suffered by the defendant—have been satisfied. Based on our conclusion that the trial court did not abuse its discretion by concluding that Wesex suffered substantial and actual prejudice as a result of the inactivity in this case and that the City's financial problems did not constitute a compelling reason for such delay, the City cannot establish that the evidentiary record fails to support a finding that the three requirements necessary for the entry of a judgment of *non pros* have been satisfied.

20

As a result, we conclude that the trial court did not commit an error of law or abuse its discretion by denying the City's Petition.

### IV.  CONCLUSION

Accordingly, we affirm the trial court's order.[7]

_____
P. KEVIN BROBSON, Judge

---

[7] Given our disposition above, we need not consider the City's remaining argument on appeal, because whether the trial court committed an error of law by sustaining Wesex's preliminary objection to Count II of the City's Complaint is irrelevant in light of the trial court's entry of judgment of *non pros*.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Farrell,                          :
              Appellant        :
                                :
        v.                          :   No. 1623 C.D. 2017
                                :
Wesex Corporation                         :

## **O R D E R**

AND NOW, this 29th day of June, 2018, the order of the Court of Common Pleas of Mercer County is hereby AFFIRMED.

 

 

P. KEVIN BROBSON, Judge